IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EQUAL EMPLOYMENT OPPORTUNITY     )
COMMISSION,                      )
                                 )
            Plaintiff,           )
                                 )
       v.                        )          No. 1:11-cv-805
                                 )
PBM GRAPHICS INC.,               )
                                 )
            Defendant.           )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

The Equal Employment Opportunity Commission ("EEOC" or "the Commission") contends that PBM Graphics Inc. ("PBM") has, since January 2003, engaged in a pattern or practice of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 (codified as amended in scattered sections of 42 U.S.C.), by favoring Hispanic temporary workers in its work-assignment practices. PBM, contending that the EEOC's suit is untimely and without merit, has filed motions for dismissal (Doc. 12) and summary judgment (Doc. 14), and PBM's motions came before the court for hearing on June 5, 2012. For the reasons that follow, the court finds that the EEOC has stated a claim upon which relief can be granted and has met all statutory prerequisites for filing suit. However, the record reveals that the EEOC's delay in bringing

this litigation was unreasonable and may have unduly prejudiced PBM, and the court will order limited discovery to resolve that question.

## I.  BACKGROUND

The complaint, viewed in a light most favorable to the EEOC for purposes of PBM's motion to dismiss, alleges the following:

PBM is a commercial printing manufacturer headquartered in Durham, North Carolina, that employs at least fifteen individuals. (Doc. 1 at 2 ¶ 4.) Though the company employs a large number of full-time employees, PBM's employment needs fluctuate based on its workload, and it routinely hires temporary workers from a placement agency to meet its production requirements. (Id. at 3 ¶ 8.) Despite the turnover in its temporary workforce, PBM employs a "core group" of temporary workers of approximately 10 to 15 individuals per shift for each of its five shifts. (Id. at 4 ¶ 9.) These "core" temporary workers enjoy the benefits of being told to return to work day after day unless management indicates otherwise, being assigned to longer-term assignments, and occasionally being asked to become permanent employees at PBM. (Id.)

During the course of an unrelated investigation into the hiring practices of PBM's staffing agency, the EEOC learned that PBM told the staffing agency that it preferred Hispanic temporary workers. (Id. ¶ 8.) According to the EEOC, although

2

PBM's staffing agency sent both Hispanic and non-Hispanic workers for PBM's consideration, PBM "disproportionately rejected" non-Hispanic workers "while Hispanic temporary workers who were equally or less qualified were allowed to work." (Id.) The EEOC contends that this practice has resulted in PBM's "core group" of temporary workers being "disproportionately composed" of Hispanic workers (id. ¶ 9) and in PBM providing fewer hours to its non-Hispanic temporary workers (id. at 5 ¶ 11). As a result, the EEOC charges, PBM intentionally engaged in a pattern or practice of employment discrimination against similarly qualified non-Hispanic temporary workers based on their national origin in two ways: first, by predominantly placing or assigning Hispanic temporary workers to its "core group" of temporary workers; and second, by assigning fewer work hours to its non-Hispanic temporary workers. (Id. ¶¶ 10-11.)

## II. ANALYSIS

### A. Motion to Dismiss

#### 1. Failure to State a Claim

PBM moves to dismiss the EEOC's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Commission has failed to allege sufficient facts to state a claim upon which relief can be granted. PBM's arguments rest on the distinction between two provisions of Title VII that grant the EEOC authority to investigate and pursue claims of

3

employment discrimination. The first of these provisions, Section 706, PBM contends, authorizes the EEOC to recover injunctive relief, back pay, and compensatory and punitive damages on behalf of particular individuals who have been victims of a company's discriminatory employment practices. (Doc. 13 at 9 (citing 42 U.S.C. § 2000e-5).) The second provision, Section 707, permits the EEOC to seek equitable relief against an employer who engages in a "pattern or practice" of discrimination. (Id. at 6 (citing 42 U.S.C. § 2000e-6).) PBM argues that the EEOC may not seek compensatory and punitive damages against an employer, as it purports to do here, merely by alleging a "pattern or practice" of discrimination under section 707. Instead, it contends, the EEOC must allege facts sufficient to state a prima facie case of discrimination -- (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment for similarly situated individuals outside the protected class -- to state a claim for compensatory or punitive damages. (Id. at 11 (quoting Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd 132 S. Ct. 1327 (2012)).) PBM contends that the EEOC's claims fail as a matter of law because the complaint does not identify a single person allegedly discriminated against, allege any facts showing that the workers who were supposedly discriminated against were

4

"equally or more qualified" than the unidentified Hispanic workers favored by PBM, or provide a factual basis to support its claim that national origin was the motivating factor in PBM's decision to assign certain Hispanic workers to its "core group" of temporary employees. (Id. at 12-14.) PBM also contends that if the EEOC may seek compensatory and punitive damages by alleging a "pattern or practice" of discrimination, it has still failed to allege facts demonstrating that its discrimination was "routine" or the company's "standard operating procedure," as required by section 707. (Doc. 13 at 7, 9.)

The EEOC responds by characterizing PBM's distinction between sections 706 and 707 as artificial and contends that the complaint states a claim of "pattern or practice" discrimination under both. (Doc. 26 at 10.) Furthermore, argues the EEOC, there is no requirement that it identify any particular individuals subject to discrimination or that it plead specific facts tending to show that similarly-situated non-Hispanic workers were treated differently from PBM's Hispanic workers. As a result, the EEOC contends, the complaint's factual allegations, while admittedly lean, suffice to state a claim for relief that is plausible on its face.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that

5

is plausible on its face." Epps v. JP Morgan Chase Bank, N.A., 675 F.3d 315, 320 (4th Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). In evaluating a motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint," Kunda v. C.R. Bard, Inc., 671 F.3d 464, 467 (4th Cir. 2011) (citation and internal quotation marks omitted), though the court should disregard "statements of bare legal conclusions" which "'are not entitled to the assumption of truth,'" Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011) (quoting Iqbal, 556 U.S. at 679). Thus, courts follow a "two-pronged approach" in assessing the sufficiency of a complaint. Robertson v. Sea Pines Real Estate Cos., 679 F.3d 278, ---, No. 11-1538, 2012 WL 1672487, at *6 (4th Cir. May 14, 2012). First, the complaint must "contain factual allegations in addition to legal conclusions" and, second, the factual allegations, accepted as true and stripped of all legal conclusions, must state a claim to relief that is "plausible on its face." Id. (citation and internal quotation marks omitted). Although the complaint need not contain "detailed factual allegations" to be plausible, it must nevertheless "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Much of the parties' dispute centers on what a plaintiff must allege to plead a "pattern or practice" of discrimination

under section 707. However, "[a] pattern or practice case is not a separate and free-standing cause of action . . . but is really 'merely another method by which disparate treatment can be shown.'" Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 355 (5th Cir. 2001) (quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1219 (5th Cir. 1995), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)); see also Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 762 (4th Cir. 1998) (finding support in Mooney for its conclusion that private, non-class action plaintiffs may not rely on a pattern or practice method of proof for Title VII claims), vacated on other grounds, 527 U.S. 1031 (1999). Indeed, like McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a case establishing a method for individuals to prove disparate treatment in the absence of direct proof of discrimination, the term "pattern or practice" is a "means by which courts can assess whether a particular form of statutorily prohibited discrimination exists." Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 183 (3d Cir. 2009); Bacon v. Honda of Am. Mfg., Inc., 370 F.3d 565, 575 (6th Cir. 2004) (characterizing a "pattern or practice" case as a "method of proving discrimination"); Majeed v. Columbus Cnty. Bd. of Educ., 213 F.3d 631, at *4 n.2 (4th Cir. 2000) (per curiam) (unpublished table decision) (explaining that

7

the term "pattern or practice" normally refers to a method of proving discrimination).

The Supreme Court has explained that such evidentiary standards are distinct from pleading requirements under Federal Rules of Civil Procedure 8(a) and 12(b). See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); see also Chao v. Rivendell Woods, Inc., 415 F.3d 342, 346 (4th Cir. 2005) ("The [Supreme] Court rejected the view that a plaintiff had to plead a prima facie case of discrimination under the evidentiary standard of McDonnell Douglas Corp. v. Green . . . to survive a 12(b)(6) motion to dismiss." (internal citation omitted)). In Swierkiewicz, for example, the Court held that a plaintiff need not allege specific facts sufficient to establish a prima facie case of discrimination under the McDonnell Douglas method of proof. 534 U.S. at 515. Yet a plaintiff must still allege facts sufficient to state each element of his claim. Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764-65 (4th Cir. 2003) ("Our circuit has not . . . interpreted Swierkiewicz as removing the burden of a plaintiff to allege facts sufficient to state all the elements of her claim."); see also Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002).

Title VII makes it an "unlawful employment practice" for any employer "to fail or refuse to hire . . . or otherwise to discriminate against any individual with respect to his

8

compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). The Fourth Circuit has explained that "[a]bsent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)), aff'd 132 S. Ct. 1327 (2012). The elements of a prima facie case, of course, may change depending on a case's "differing factual situations." See E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001) (quoting McDonnell Douglas, 411 U.S. at 802 n.13).

Here, the EEOC's complaint, while skeletal, provides "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), by stating facts sufficient to make its claim of discrimination plausible. Although PBM challenges the description of "non-Hispanic" as a protected class, courts interpret national origin discrimination broadly; Title VII protects individuals who are discriminated against because they are part (or not part) of a particular ethnic group. See Pejic v. Hughes Helicopters, Inc., 840 F.2d

9

667, 672-73 (9th Cir. 1988) (rejecting defendant's argument that national origin discrimination was inapplicable to "ethnic groups" and noting that "'national origin' includes the country of one's ancestors"); Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston, --- F. Supp. 2d ---, ---, Civ. A. No. H-10-1949, 2011 WL 5977807, at *4 (S.D. Tex. Nov. 29, 2011) (noting that "several courts have interpreted claims of discrimination based upon the plaintiff's status of being 'Hispanic' as being a national origin discrimination claim" and citing cases); see also De Volld v. Bailar, 568 F.2d 1162, 1164-65 (5th Cir. 1978) (concluding that an employer could not have discriminated on the basis of national origin when the two people who applied for the job were "of the same ethnic origin"). In fact, the EEOC has concluded that "[n]ational origin discrimination . . . includes discrimination against anyone who does not belong to a particular ethnic group, for example, less favorable treatment of anyone who is not Hispanic." EEOC, EEOC Compliance Manual, National Origin Discrimination, § 13.II.B (2002), available at http://eeoc.gov/policy/docs/national-origin.html (last visited June 18, 2012).[1]  Thus, the EEOC has met its burden of

---

[1]  An administrative agency's interpretation of its statute does not control a court's interpretation; in the absence of clear congressional direction, the court must still determine if the agency's interpretation is permissible. See United States v. Mead Corp., 533 U.S. 218, 230-31 & n.12 (2001); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984); Hosh v. Lucero, --- F.3d ---, No. 11-1763, 2012 WL 1890390, at *2 (4th Cir.

identifying a protected class of individuals by alleging that PBM's work-assignment practices discriminated against its non-Hispanic temporary workers. (Doc. 1 at 4-5 ¶¶ 10, 11.)

An applicant for an employment position, of course, cannot demonstrate "satisfactory job performance" since he does not have a job that he could perform satisfactorily. Cf. Coleman, 626 F.3d at 190 (listing satisfactory job performance as an element of a claim of discrimination under Title VII). Instead, a failure to hire or promote claim requires a showing that the individual "applied and was qualified for a job for which the employer was seeking applicants." See Sears Roebuck, 243 F.3d at 851; Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 319 n.6 (4th Cir. 2005) (explaining that in the failure to promote context an individual must demonstrate that he "applied for the position in question").

Here, the complaint indicates that non-Hispanic temporary workers applied for positions at PBM by alleging that the company "routinely utilized a temporary workforce for its production needs" during the relevant time period and that to satisfy those needs it "sought and obtained referrals for

May 25, 2012). Yet agency interpretations contained in policy statements or agency manuals, such as the EEOC's manual cited here, are "entitled to respect." Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000). Thus, a court "may properly resort [to such interpretations] for guidance" assuming that the court finds the agency's reasoning persuasive. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

Case 1:11-cv-00805-TDS-JEP   Document 35   Filed 06/28/12   Page 11 of 70

temporary work from a placement agency," which referred qualified Hispanic and non-Hispanic employees to PBM. (Doc. 1 at 3-4 ¶ 8.) However, during argument on the motions, the EEOC's counsel represented that the complaint does not include an allegation that PBM failed to hire temporary workers because of their national origin. Thus, the EEOC's claim is limited to temporary workers who actually worked for PBM and the allegations that PBM regularly discriminated against its non-Hispanic temporary workers by (1) selecting more Hispanic workers for the core group (id. at 4-5 ¶ 10) and giving Hispanic workers a greater number of work hours than their non-Hispanic counterparts (id. at 5 ¶ 11).[2]

The complaint lacks an express allegation that any of PBM's non-Hispanic temporary workers actually applied for positions in the core group of temporary workers or that those workers asked for additional work hours. However, the complaint does characterize the alleged victims -- a group the EEOC claims is

---

[2] Limiting the complaint in this way presumably will be relevant later in the litigation. Generally, the EEOC may rely on a comparison between the racial composition of an employer's workforce and the racial composition of the general population of qualified workers. See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308-09 & n.13 (1977). However, the Supreme Court has noted that a comparison between the racial makeup of individuals actually applying for jobs and the racial makeup of those selected from that pool would be "very relevant" to a claim of discrimination. Id. at 308 n.13. Here, the EEOC has disavowed any claim of discrimination in PBM's initial hiring of the temporary workers, and the EEOC represented at the hearing that it will seek to compare those temporary workers at PBM eligible for more hours or assignment to the core group with those actually selected for those additional hours or assignments.

12

comprised of individuals who already worked in some temporary capacity for PBM -- as "applicants" (id. ¶ 12), implying that they did apply for positions as core workers or for additional work hours. Because the court is bound to construe the complaint in a light most favorable to the EEOC at the motion to dismiss stage, Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999), it concludes that the use of the term "applicants" creates a plausible inference that the aggrieved class of workers are those who already had performed work for PBM and who either applied for assignments as core temporary workers or requested greater work hours.

PBM also contends that the complaint lacks any facts supporting the EEOC's claims that the two sets of employees were "equally qualified." (Doc. 13 at 12.) PBM is correct to note that the complaint does not identify the detailed qualifications of each temporary worker who performed work for PBM from 2003 to the present but, contrary to PBM's argument, the court is not left to "blindly accept" the EEOC's conclusions. (See id.) The complaint alleges that PBM "sought and obtained referrals for temporary work from a placement agency" and that the placement agency referred both Hispanic and non-Hispanic workers to PBM. (Doc. 1 at 3-4 ¶ 8.) The complaint also alleges that PBM's temporary workers performed "light bindery handwork." (Id.) Given that the court is bound to draw all reasonable inferences

in the non-moving party's favor, the fact that all temporary workers were referred by the same placement agency to perform unskilled[3] "light bindery handwork" is sufficient to create the inference that PBM's Hispanic and non-Hispanic temporary workers were comparably qualified.

PBM argues further that the complaint fails to account for the possibility that PBM may have preferred certain workers who happened to be Hispanic for reasons other than their national origin. If PBM has a non-discriminatory reason for favoring its Hispanic workers, it is free to raise the argument at summary judgment or trial, but, given the plausibility of the complaint's allegations that national origin discrimination was the basis for PBM's actions, any such possibilities will not require dismissal at this stage of the proceedings. See Neitzke v. Williams, 490 U.S. 319, 327 (1989) (explaining that a court should not dismiss an action merely because it may disbelieve a complaint's factual allegations).

The complaint also meets the requirement that an adverse employment action have occurred. In the failure to hire context, an employer's decision not to give a job to a qualified applicant is clearly an adverse employment action. Thurston v. Am. Press, LLC, 497 F. Supp. 2d 778, 784 (W.D. Va. 2007); see

---

[3] Although the EEOC does not use the word "unskilled" in the complaint, PBM's counsel acknowledged in the hearing that "many" of the company's temporary workers worked as unskilled laborers.

also _Tabor v. Thomas Built Buses, Inc._, No. 1:08CV614, 2010 WL 148431, at *4 (M.D.N.C. Jan. 12, 2010) (explaining that at least in a retaliation suit, "adverse employment action[] includes failure to hire a qualified applicant").  An adverse employment action can also include an employer's decision to demote an employee or relegate him to "reduced pay, diminished opportunity for promotion, reduced responsibility, or lower rank." _Royster v. Costco Wholesale Corp._, 378 F. Supp. 2d 595, 605 (M.D.N.C. 2005) (citing _Boone v. Goldin_, 178 F.3d 253, 256 (4th Cir. 1999)).  Here, both PBM's alleged failure to assign certain temporary workers to its core group and its decision to relegate other workers to reduced pay or a lower rank, if true, constitute the type of harm to an employee's employment status sufficient to satisfy the adverse employment action element under Title VII.

The final element -- that individuals inside the protected class received treatment different from similarly situated employees outside the protected class -- is the most contentious.  PBM argues that the complaint fails to allege any specific facts sufficient for the court to assess whether the claim that the company engaged in a pattern or practice of employment discrimination is plausible.  (Doc. 13 at 8.)  Here, PBM repeats its arguments concerning the complaint's failure to identify a single person against whom the company discriminated,

15

failure to state facts establishing a plausible basis for believing that the non-Hispanic workers were similarly situated to the favored Hispanic workers, and failure to allege facts showing that discrimination based on national origin was the reason Hispanic temporary workers worked more hours at PBM than the company's non-Hispanic temporary workers. (Id. at 12-13.) Indeed, when the court pressed PBM at the hearing to articulate what facts it contends were available that the EEOC should have pleaded, its counsel reiterated these very arguments. The EEOC, in contrast, maintains that the complaint "alleges sufficient facts from which this Court can draw the reasonable inference that Defendant acted unlawfully in its placement and assignment practices." (Doc. 26 at 10.)

It is difficult for the court to imagine a complaint any thinner in factual allegations that should survive a motion to dismiss. However, PBM overstates the EEOC's burden at the pleading stage of litigation. While factual allegations in the complaint "must be enough to raise a right to relief above the speculative level," a complaint need not raise "detailed factual allegations." Twombly, 550 U.S. at 555. Thus, contrary to PBM's assertions, the complaint is not deficient for failing to identify the numerous alleged victims of discrimination or setting out the names of specific employees at PBM who expressed

16

a preference for Hispanic temporary workers.[4]  And as noted
earlier, the other alleged deficiencies are not fatal to the
complaint at this stage.  It is sufficient that the facts, taken
as true, allege different treatment among similarly situated
workers based on national origin.  Stripped of its legal
conclusions, the complaint alleges that PBM's placement agency
referred "both Hispanic and non-Hispanic temporary workers [but
that] non-Hispanic workers were . . . rejected by [PBM] while
Hispanic temporary workers who were equally or less qualified
were allowed to work."  (Doc. 1 at 3-4 ¶ 8.)  In addition, the
complaint alleges that other non-Hispanic temporary workers
"were not assigned to [PBM's] core group and worked shorter-term
assignments" than equally or less qualified Hispanic workers,
and the company "assign[ed] a greater number of work hours to
Hispanic temporary workers than to similarly qualified non-
Hispanic temporary workers."  (Id. at 4-5 ¶¶ 9, 11.)  These
factual allegations are sufficient to make it plausible that PBM
treated its temporary workers in the protected class -- non-
Hispanics -- differently from those outside the protected class
because of their national origin.

---

[4]  While a putative class action by an individual would require the
naming of at least one plaintiff, it bears noting that EEOC is not
bound by the class action pleading rules in its claim under sections
706 or 707.  Gen. Tel. Co. of the Northwest, Inc. v. E.E.O.C., 446
U.S. 318, 333-34 (1980); E.E.O.C. v. Int'l Profit Assocs., Inc., No.
01 C 4427, 2007 WL 844555, at *8 (N.D. Ill. Mar. 16, 2007).

Still, PBM argues that U.S. E.E.O.C. v. Global Horizons, Inc., CV. NO. 11-00257 DAE-RLP, 2011 WL 5325747 (D. Haw. Nov. 2, 2011), and E.E.O.C. v. Bass Pro Outdoor World, LLC, No. 4:11-cv-03425, 2012 WL 1965685 (S.D. Tex. May 31, 2012), counsel a different result. Superficially, both cases raise similar issues, but PBM's reliance on them is ultimately misplaced.

In Global Horizons, the EEOC alleged that certain defendants engaged in a pattern or practice of discrimination based on national origin and race by recruiting Asian men to perform work in the United States but then charging them exorbitant recruiting fees on their arrival. 2011 WL 5325747, at *1. The court dismissed the complaint because it lacked "sufficient detail with respect to the employment relationship between each of the [m]oving [d]efendants and [c]laimant" and failed to sufficiently detail the alleged wrongful conduct. Id. at *8. The shortcomings in the Global Horizons complaint are distinct from those PBM has identified here. The problem in Global Horizons was that the EEOC failed to support its legal conclusions that the moving defendants were "joint employers" with a certain non-moving defendant or that the defendants engaged in wrongful conduct. The complaint in this case, in contrast and as explained above, contains factual assertions to support each element of the claim.

18

Bass Pro is also distinguishable from this case in important respects. In that case, the court concluded that the EEOC's complaint failed to state a plausible claim that the defendant had engaged in a nationwide pattern or practice of discrimination in failing to hire Hispanic and African-American individuals to salaried and hourly positions. Bass Pro, 2012 WL 1965685, at *14. The court found that statistics related to the company's hiring practices for managers were irrelevant (for pleading purposes) to the claims that the company failed to hire people to a number of non-managerial positions within the company and found that particular instances of offensive conduct directed at Hispanics and African-Americans in certain stores failed to plausibly allege that the company had engaged in a "company-wide pattern or practice" of discrimination. Id. Here, in contrast, the EEOC has alleged facts pertaining to the particular individuals and employment positions subject to discrimination -- non-Hispanic temporary workers seeking additional hours or to become members of the company's core group of temporary workers -- and has made clear that the discriminatory acts in question are limited to PBM's facilities in Durham, which apparently used the same staffing agency and practices for filling their needs for temporary employees.

In sum, the EEOC has sufficiently pleaded facts to state a claim for relief that is plausible on its face. Cf. Twombly,

19

550 U.S. at 570. Accordingly, PBM's motion to dismiss on this basis will be denied.

### 2. Scope of the EEOC Charge

PBM also moves to dismiss the EEOC's complaint under Rule 12(b)(1) based on a lack of subject matter jurisdiction. According to PBM, this court lacks jurisdiction to consider any allegations in the complaint that were not also raised in the underlying administrative charge that led to the EEOC's investigation. Specifically, PBM identifies three potentially limiting discrepancies between the EEOC's charge and the complaint. First, PBM contends that the complaint attempts to expand the class of those who were discriminated against by changing its definition of the victims of PBM's employment practices from "American (non-Hispanic)" to simply "non-Hispanic." (Doc. 13 at 15.) Second, it argues that the complaint impermissibly exceeds the scope of the charge by raising an allegation that PBM provided fewer hours to its non-Hispanic temporary workers -- an allegation not identified in the charge. (Id. at 16.) Finally, it contends that by seeking relief for activities since January 1, 2003, rather than January 1, 2004, the date alleged in the charge, the complaint impermissibly expands the relevant dates of the potentially discriminatory activity. (Id. at 16-17.)

A motion to dismiss under Rule 12(b)(1) challenges a federal court's subject matter jurisdiction to hear the dispute raised in the complaint. Aguilar v. LR Coin Laudromat [sic], Inc., Civ. A. No. RDB-11-02352, 2012 WL 1569552, at *2 (D. Md. May 2, 2012). When a party moves under Rule 12(b)(1), he is "afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Thus, the facts alleged in the complaint are taken as true, and the operative question is whether the complaint alleges sufficient facts to invoke the court's subject matter jurisdiction. Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). Ultimately, the plaintiff bears the burden of establishing subject matter jurisdiction. Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999).

A plaintiff's failure to exhaust his administrative remedies for a Title VII claim deprives the federal courts of subject matter jurisdiction. Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009). One important step in fulfilling the administrative exhaustion requirements of Title VII is that the complaining party must file a charge with the EEOC. Id. The purpose of the administrative exhaustion requirement is to provide the employer with notice of the charge, permit the EEOC to investigate the charge, and give the parties an opportunity to resolve their dispute without resorting to litigation. Miles

21

v. Dell, Inc., 429 F.3d 480, 491 (4th Cir. 2005). As with private litigants seeking relief under Title VII, when the EEOC files an administrative charge, it, too, must satisfy the statute's exhaustion requirements. See E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002) (per curiam) (explaining that "the EEOC itself" must "exhaust certain administrative remedies before filing a suit for employment discrimination").

Merely filing a charge with the EEOC, however, is insufficient to exhaust a party's administrative remedies. "A charge is sufficient only if it is sufficiently precise to identify the parties, and to describe generally the actions or practices complained of." Jones, 551 F.3d at 300 (citation and internal quotation marks omitted). As such, the scope of the factual allegations in the administrative charge limits matters that may be complained of in resulting litigation. Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." Id. at 506. Thus, the scope of litigation is confined by the "scope of the administrative investigation that can reasonably be expected

22

to follow the charge of discrimination." Chisolm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).

Applying the above standards to the facts in this case, it is evident that the EEOC's charge adequately exhausted Title VII's administrative remedies for the claims raised in the current complaint. While PBM is correct to note that the complaint's reference to "non-Hispanic" is a potentially broader category than the charge's "American (non-Hispanic)" classification, both the charge and the complaint make clear that PBM is alleged to have engaged in national origin discrimination by favoring Hispanic workers. (Cf. Doc. 1 at 3-4 ¶ 8 (claiming that PBM favored Hispanic workers to the exclusion of non-Hispanic workers); Doc. 28-2 (Charge of Discrimination) at 3 (charging that PBM solicited the placement of Hispanic workers to the exclusion of persons of other races and national origins).) Dropping "American" from the category of individuals subject to discrimination, therefore, did not change the type of discrimination alleged or materially alter the class of potential victims. Cf. Chacko, 429 F.3d at 509 (explaining that claims are generally barred where (1) a charge indicates one basis of discrimination (such as race) and the complaint indicates another basis (such as sex) or (2) a charge alleges one type of discrimination (such as failure to promote) and the complaint alleges another type (such as discrimination in pay)).

23

In addition, the charge concludes by specifically identifying the "aggrieved class" as "all non-Hispanic persons" potentially affected by PBM's alleged discrimination. (Doc. 28-2 at 3.) This language is sufficient to put PBM on notice that the EEOC's charge was not limited to non-Hispanics of American origin.

Equally unavailing is PBM's attempt to preclude litigation of the EEOC's claim that the company provided fewer work hours to its non-Hispanic employees. An administrative charge is simply a "jurisdictional springboard" for an investigation into an employer's potentially discriminatory practices, and nothing in a charge "strictly cabins the investigation that results therefrom." E.E.O.C. v. Gen. Elec. Co., 532 F.2d 359, 364 (4th Cir. 1976). So long as claims raised in a complaint are "reasonably related" to the allegations in the charge, the charge will not limit the ensuing litigation. Chacko, 429 F.3d at 506. Thus, "where judicial claims are rooted in the same basis of discrimination specified in the charge (i.e., race, sex, national origin), the court may consider them, notwithstanding the fact that additional aspects of that basis of discrimination are alleged in the complaint." Jones v. Metro. Denver Sewage Disposal Dist. No. 1, 537 F. Supp. 966, 970 (D. Colo. 1982); see also E.E.O.C. v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994) (finding that allegations that a company failed to rehire women was "reasonably related" to a

24

charge that the company disproportionately laid off female employees). Here, the charge made clear that the EEOC believed PBM was discriminating on the basis of national origin. The EEOC's claims that PBM provided fewer hours to its non-Hispanic employees and denied them positions with the core group of temporary workers are premised on the same basis of discrimination and, given the allegation that PBM favored Hispanic employees despite significant turnover in its temporary workforce, are reasonably related to the allegations in the administrative charge. Cf. Sydnor v. Fairfax Cnty., Va., No. 11-1573, 2012 WL 2312775, at *3 (4th Cir. June 19, 2012) (explaining that the Fourth Circuit has found administrative remedies to be exhausted "where both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct" (citing Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000))).

Finally, PBM's effort to limit the timeframe of this suit to January 1, 2004, rather than January 1, 2003, is also without merit.[5] Administrative charges filed with the EEOC must contain,

---

[5] PBM also contends that because one portion of the EEOC charge states that the "[e]arliest" and "[l]atest" "date(s) [on which] discrimination took place" was October 17, 2005 (Doc. 28-2 at 2) the Commission should only be able to seek recovery for any discrimination occurring on that day (Doc. 13 at 16). This argument is plainly without merit, because the charge also notes that the EEOC alleges a "continuing action" and later alleges that the violations have occurred "since at least January 1, 2004." (Doc. 28-2 at 3.) October 17, 2005, is simply the date on which the charge was filed.

among other things, a "statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3). Yet courts have recognized that "at the time a charge is filed, the EEOC may be uncertain as to the temporal scope of the allegedly unlawful practices." E.E.O.C. v. K-Mart Corp., 694 F.2d 1055, 1064 (6th Cir. 1982). This uncertainty is particularly likely where a pattern or practice of discrimination is alleged, and the Supreme Court has held that in such cases the EEOC should identify, "[i]nsofar as [it] is able," "the periods of time in which [it] suspects the discrimination to have been practiced." E.E.O.C. v. Shell Oil Co., 466 U.S. 54, 72-73 (1984). It follows that the EEOC should not be bound by a rigid rule in identifying the timeframe of an employer's alleged discrimination. See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998) (requiring that the date alleged in the charge only be "an approximate time period"). In this case, the charge alleges a "pattern or practice" of discrimination (which necessarily occurs over a period of time) (Doc. 28-2 at 3), indicates the conduct was ongoing at the time of the charge's filing (id. at 1), and notes that the discrimination began "at least" as soon as January 1, 2004 (id. at 3). Taken together, these allegations are reasonably related

to the EEOC's decision to complain about PBM's practices beginning on January 1, 2003.

Thus, while minor differences exist between the EEOC's charge and the resulting complaint, PBM has identified none that rises to the level of depriving this court of subject matter jurisdiction over the complaint. Consequently, PBM's motion to dismiss for lack of subject matter jurisdiction will be denied.

### 3. Title VII's 180-Day Claim-Filing Period

PBM also moves to dismiss any claims for individual relief arising outside of Title VII's 180-day window for filing charges of discrimination. According to PBM, "[a] plaintiff who never filed a charge or who did not file a charge within 180 days of the alleged discrimination is barred from pursuing a lawsuit under Title VII." (Doc. 13 at 17.) Citing Calvert Group, 551 F.3d 297, PBM contends that the statutory bar may be jurisdictional, but that, in any event, the EEOC may not revive claims that were stale at the time the charge is filed, even in pattern or practice litigation. (Doc. 13 at 17-18.) The EEOC, in contrast, contends that Title VII's 180-day limitations period is inapplicable to pattern or practice claims and that, if there is a statutory limit on some of its claims, the "continuing violation doctrine" revives them. (Doc. 26 at 18-20.)

27

In non-deferral states like North Carolina, <u>Lane v. Lucent</u> <u>Techs., Inc.</u>, 388 F. Supp. 2d 590, 598 (M.D.N.C. 2005) (characterizing North Carolina as a non-deferral state), a complaining party must file a charge with the EEOC within 180 days after the alleged unlawful employment practice occurred, 42 U.S.C. § 2000e-5(e)(1). While a plaintiff's complete failure to file a charge deprives the court of subject matter jurisdiction, <u>Jones</u>, 551 F.3d at 300, the untimely filing of an administrative charge is not a jurisdictional bar to suit, <u>Zipes v. Trans World</u> <u>Airlines, Inc.</u>, 455 U.S. 385, 393 (1982).[6] Instead, untimely charges "should be addressed within the context of a 12(b)(6) motion" -- at least where the defendant so moves. <u>Edwards v.</u> <u>Murphy-Brown, L.L.C.</u>, 760 F. Supp. 2d 607, 614 (E.D. Va. 2011). Here, of course, the EEOC filed a charge on October 17, 2005, and exhausted its administrative requirements. Accordingly, to the extent that PBM contends that this court lacks subject matter jurisdiction, it is mistaken. <u>Jones</u>, 551 F.3d at 300.

Yet PBM's mistake does not entirely negate its argument for dismissal. Some courts have held that a party may not seek relief for a pattern or practice of discrimination where the actions giving rise to the complaint arose outside the 180-day statutory period. <u>See, e.g.</u>, <u>E.E.O.C. v. Burlington Med.</u>

---

[6] Title VII does not refer to the 180-day charge-filing period as a statute of limitations, but the Court in <u>Zipes</u> held that it is "like a statute of limitations" and, thus, "is subject to waiver, estoppel, and equitable tolling." 455 U.S. at 393.

28

Supplies, Inc., 536 F. Supp. 2d 647, 658-59 (E.D. Va. 2008). These courts note that section 707 provides that all pattern or practice cases "shall be conducted in accordance with the procedures set forth in [section 706]." 42 U.S.C. § 2000e-6(e). This language indicates that even pattern or practice litigation should be "'conducted in accordance with the' 180-day limitations period set out in [section 706(e)]." E.E.O.C. v. Optical Cable Corp., 169 F. Supp. 2d 539, 546 (W.D. Va. 2001). As a result, section 706's limitations period "will primarily prevent the EEOC from recovering monetary damages on behalf of individuals with stale claims." E.E.O.C. v. Kaplan Higher Educ. Corp., 790 F. Supp. 2d 619, 624 (N.D. Ohio 2011). Although individuals discriminated against outside of the 180-day limitations period may nevertheless be used as evidence of a pattern or practice of discrimination, such individuals may not seek individualized monetary relief for their claims. Burlington Med., 536 F. Supp. 2d at 659-60.

While there is authority to the contrary, see, e.g., E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc., 990 F. Supp. 1059, 1084 (C.D. Ill. 1998) ("[A] pattern or practice case is not subject to a limitations period, [and] all individual claims that seek relief based on this pattern or practice will be allowed into the individual relief phase."), this court is persuaded that the better view is that the EEOC may not seek

29

monetary relief for stale claims -- those arising prior to 180 days before the filing of the charge. Therefore, any of the EEOC's claims for monetary relief resting on allegations of discrimination that occurred more than 180 days prior to October 17, 2005 -- the date of the charge -- are subject to dismissal.

Anticipating this ruling, the EEOC nevertheless contends that the "continuing violation doctrine" may revive its potentially stale claims. (Doc. 26 at 19-20.) In the Fourth Circuit, the continuing violation doctrine "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). The doctrine is based on the idea that some discriminatory employment practices -- namely hostile environment claims -- are "composed of a series of separate acts that collectively constitute one unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-17 (2002). While the Supreme Court has refrained from ruling on whether the continuing violation doctrine applies in pattern or practice cases, id. at 115 n.9, many courts have held that the doctrine does not apply to "discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination," Williams v. Giant Food, Inc., 370 F.3d 423, 429 (4th Cir. 2004) (declining

to apply the continuing violation doctrine where plaintiff sought to avoid section 1981's three-year statute of limitations applicable to her failure-to-promote claims (citing Davidson v. Am. Online, Inc., 337 F.3d 1179, 1185-86 (10th Cir. 2003), and Cherosky v. Henderson, 330 F.3d 1243, 1246-48 (9th Cir. 2003))).

E.E.O.C. v. Freeman, No. RWT 09cv2573, 2010 WL 1728847 (D. Md. Apr. 27, 2010), is illustrative. There, the court concluded that the continuing violation doctrine was inapplicable to claims of a pattern or practice of refusing to hire job applicants. Id. at *6. First, the court noted, the continuing violation doctrine only permits the revival of stale claims -- not stale parties. Id. Where the EEOC seeks to enlarge the number of individuals entitled to recover rather than the claims a single individual may bring, the doctrine has no applicability. Id. Second, the court held that "[a] pattern or practice of refusing to hire job applicants does not constitute a continuing violation." Id. "Linking together a series of decisions not to hire under the label of pattern or practice," the court explained, "does not change the fact that each decision constituting the pattern or practice is discrete." Id.

Here, each decision to limit the working hours or not hire non-Hispanic workers was a discrete decision. Thus, as in Freeman, the continuing violation doctrine affords the EEOC no help in reviving its stale claims. Accord Davis v. Coca-Cola

31

Bottling Co. Consol., 516 F.3d 955, 970 (11th Cir. 2008) (holding that some of the defendant's allegedly discriminatory hiring decisions and light work assignments "constituted discrete acts" and were time barred despite plaintiff's claims of a pattern or practice of discrimination); Kaplan Higher Educ., 790 F. Supp. 2d at 625 ("Even in a pattern-or-practice case such as this, the discrete decisions to refuse to hire and to terminate employment cannot be linked together to create a continuing violation.").

The EEOC contends that at least some cases reach the opposite result. Yet the Commission's cases are distinguishable. In Patterson v. American Tobacco Co., 634 F.2d 744 (4th Cir. 1980) (en banc), vacated, 456 U.S. 63 (1982), for example, the Fourth Circuit concluded that a company's discriminatory promotional policies constituted a "continuing pattern or practice of discrimination" that resulted in "continuing violations" of Title VII. Id. at 751. The holding of American Tobacco, however, was simply that a failure to have challenged a discriminatory promotional policy (locking women and black employees into unfavorable job positions) at its inception did not bar later claims for harm occurring within the timely period based on the continued effect of the policy. Id. Taylor v. Home Ins. Co., 777 F.2d 849 (4th Cir. 1985), is equally unavailing. There, the court permitted an individual to

revive a stale claim for an age-based demotion under the continuing violation doctrine where he suffered a second age-based demotion within the limitations period and he filed his charge within the statutory period of the last occurrence. Id. at 856-57. While the court permitted the plaintiff to seek relief for both demotions, it also noted that the unlawful employment practice continued into the limitations period and that the plaintiff's two claims were similar.[7] Id. at 857. Here, in contrast, the EEOC is seeking to revive stale claims involving victims of discrimination who may not have suffered injury inside the statutory period.[8]

In sum, the EEOC may not seek relief on behalf of individuals who allegedly suffered discrimination more than 180 days prior to the filing of the EEOC's charge, and the continuing violation doctrine, which revives stale claims, not stale parties, is inapplicable to the facts of this case, at least for individuals who suffered discrimination entirely outside of the statutory period, unless the worker also

_____

[7] At least one district court in the Fourth Circuit has found Taylor to be non-binding on the basis that "it does not provide a specific test for identifying when an action is part of a continuing practice." Talbot v. Mobil Corp., 46 F. Supp. 2d 468, 471 (E.D. Va. 1999). Thus, Taylor is distinguishable on this basis as well.

[8] Chisolm v. U.S. Postal Service, 665 F.2d 482 (4th Cir. 1981), which the EEOC also cites, is distinguishable in that the plaintiffs there were employees of the federal government, id. at 486, which is covered by a different section of Title VII than private employers, see 42 U.S.C. § 2000e-16, and is not bound by a statutory charge-filing period, Chisolm, 665 F.2d at 490 n.11.

experienced discrimination within the statutory period as well. Therefore, any claims for monetary relief for individuals suffering discrimination only during the period prior to April 19, 2005 -- 180 days before the filing of the charge -- are presumptively barred and subject to dismissal. While the EEOC may use stale claims as evidence of a pattern or practice of discrimination at PBM, the Commission may not seek monetary relief for stale claims. To the extent PBM's motion seeks to dismiss these stale claims for monetary relief, the motion will be granted; in all other respects it will be denied.

### B. Motion for Summary Judgment

In addition to their argument for dismissal pursuant to Rule 12, PBM also contends that it is entitled to summary judgment because (1) the EEOC failed to fulfill its statutory duty to conciliate certain claims against it and (2) the equitable doctrine of laches bars the EEOC's suit.

Federal Rule of Civil Procedure 56(a) permits a district court to grant summary judgment "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" T-Mobile Ne. LLC v. City Council of City of Newport News, Va., 674 F.3d 380, 385 (4th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). In evaluating motions for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any," Boitnott v. Corning Inc., 669 F.3d 172, 175 (4th Cir. 2012) (citation and internal quotation marks omitted), but it "'view[s] all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party,'" Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009) (alteration in original) (quoting Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 603 (4th Cir. 2002)). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to a material fact and their entitlement to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

As to PBM's motion for summary judgment, the undisputed facts show the following:

As noted, the EEOC filed its charge against PBM on October 17, 2005, alleging that the company (1) failed to recruit, place, or hire individuals for temporary work assignments because of their races or national origins, (2) solicited the placement of Hispanic workers to the exclusion of individuals of other races or national origins, and (3) refused temporary work assignments to individuals because of their races or national origins. (Doc. 28-2 at 3.) On November 10, 2005,[9] the EEOC sent

_____

[9] Title VII requires that notice of the charge be sent to an employer within 10 days of the charge's filing. 42 U.S.C. § 2000e-5(b). The

35

PBM notice of the charge and requested that the company respond with a position statement by December 1, 2005. (Doc. 28-3 (Whitlow Declaration) at 2 ¶ 5.) Shortly thereafter, however, the EEOC transferred the case to its Raleigh Area Office, and, on December 8, 2005, investigators there submitted their own requests for information ("RFI") and for a position statement. (Id. at 3 ¶ 7.)

The EEOC's December 2005 RFI asked PBM, among other things, to "[i]dentify all individuals responsible for" communicating with the company's staffing agency for temporary workers, "[d]escribe in detail the method used . . . to request workers" from the staffing agency, and "[d]escribe in detail the method used . . . to receive and process [temporary] workers" provided by the staffing agency, including information about "how it is determined how long each temporary employee . . . [would] work[] for PBM." (Doc. 28-7 at 2-3.) In addition, the RFI asked for identifying information concerning "each person who is responsible for requesting temporary job assignments" from the company's staffing agency. (Id. at 3.) The EEOC indicated that PBM's response should be filed by January 6, 2006. (Id. at 1.)

---

EEOC's two-week delay (beyond the statutory ten-day period) in complying with this requirement at the outset of the investigation lends support to PBM's theory that the EEOC dithered in its prosecution of the case.

PBM requested two one-week delays, but on January 20, 2006, the company categorically denied "the charge that it requested or preferred Hispanic temporary workers over temporary workers who were non-Hispanic." (Doc. 28-8 at 2.) It explained that each of its shifts had a "core group of 'regular' temporary workers" who were the "best" temporary workers, but that the group's composition was "fluid," and that the company was "often required" to request additional temporary workers as its employment needs fluctuated. (Id. at 3-4.) PBM also responded to the EEOC's request for information, explaining its relationship with its staffing agency and identifying sixteen employees who communicated with the staffing agency to fill PBM's needs for temporary workers. (Doc. 28-9 at 2, 6.) The company augmented its response in March 2006 by further explaining its project tracking system and how the company determined the number of temporary workers that it needed for particular jobs. (Doc. 28-3 at 3-4 ¶ 8.)

In March 2006, the EEOC interviewed two of the sixteen employees PBM had identified as being responsible for communicating with its staffing agency: Jerald Long, a bindery manager; and Timothy James, a finishing manager. (Id.) During the interviews, the EEOC's investigators also toured PBM's

facility for the first time.[10]  (Id.)  Later that spring, on April 27, the EEOC interviewed another PBM employee, David Blad.[11]  (Id. ¶ 9.)

Once this information was collected, the EEOC spent nearly a year, from April 2006 to March 2007, "analyz[ing] the defenses raised by [PBM] in its position statement and conduct[ing] labor availability analyses regarding [PBM's] temporary workforce." (Id. ¶ 10.)  On November 14, 2006, the EEOC also received data from PBM's staffing agency that identified all of the company's temporary workers during the period from January 1, 2004, through January 31, 2005.[12]  (Id.)

Interaction with PBM resumed in April 2007 when the EEOC requested additional information about how PBM determined the race or ethnicity of its temporary workforce and documentation on all temporary workers sent to PBM by its staffing agency. (Id. at 4-5 ¶¶ 11, 14.)  PBM, however, informed the EEOC that it and its employment agency did not have "a record of temporary workers who were summoned to report to [PBM] or who were sent to

_____

[10]  According to the complaint, PBM operated two facilities at the time of the EEOC's initial visit.  (Doc. 1 at 3 ¶ 7.)  It is not clear which facility the EEOC visited in March 2006.

[11]  David Blad was not one of the sixteen PBM employees responsible for communicating with PBM's staffing agency about the company's need for temporary workers (cf. Doc. 28-9 at 6), and his role at the company is unclear from the record.

[12]  The EEOC does not make clear when it requested this information from PBM's staffing agency.

[PBM] if those temporary workers did not actually clock any time." (Doc. 28-15 at 1.) All of PBM's data, the company explained, involved individuals "who actually worked at PBM." (Id.) PBM provided information on those workers on May 15, 2007, in a document which, when printed, totaled 9,733 pages. (Doc. 28-3 at 5 ¶ 15; Doc. 28-16.)

PBM's release of information sparked a flurry of discussions between the EEOC and PBM as the EEOC's investigators attempted to understand the various categories of employees identified in the database. (See Doc. 28-3 at 6 ¶¶ 16-17.) On May 25, 2007, the EEOC also received additional information relating to temporary workers who worked at PBM in 2003 and from February 2005 to April 2007.[13] (Id.) Apparently, though, by late May 2007 the meaning of PBM's database was clear, and the EEOC used the next three months (until August 2007) to develop a database of all 3,929 temporary workers who worked at PBM from January 1, 2003 through August 22, 2007. (Id.)

Once its database was compiled on August 22, 2007, the EEOC requested social security numbers on each of the temporary employees identified in the database -- information that PBM provided by August 30, 2007. (Doc. 28-21 at 1.) The EEOC used

---

[13] The record does not make clear when the EEOC first requested information about temporary workers who performed jobs for PBM in 2003, and 2005 through 2007. As late as April 20, 2007, however, the EEOC requests for information defined the "relevant period" as running from January 1, 2004, through December 31, 2005. (Doc. 28-14 at 1.)

that information to request national origin identifying information for PBM's temporary workers from the North Carolina Department of Motor Vehicles, and from October 4, 2007 through January 15, 2008, the EEOC "conducted a statistical analysis" of the hours worked by PBM's temporary workers based on their national origin. (Doc. 28-3 at 7 ¶ 19.)

On February 28, 2008 -- now some two and a half years after the EEOC filed its charge and over two years since PBM had identified the workers in charge of supervising its temporary workers -- the EEOC attempted to schedule interviews with ten PBM employees (six of whom were among the sixteen employees responsible for communicating with PBM's temporary staffing agency).[14]  (Doc. 28-22 at 1.)  The EEOC ultimately interviewed six of the ten individuals (just two of whom were responsible for communicating with PBM's staffing agency).[15]  (Doc. 28-3 at 7-8 ¶ 20.)

As the EEOC was attempting to interview these individuals, Consolidated Graphics, Inc., a publically traded company,

---

[14]  The ten employees were Raul Diaz Zavala, Oscar Armando Sosa, Alan Ramos Tiznado, Gregory Alan Pullman, Richard Lee Brown, Lee Ann Lozano, Jackeline Voorhees, Justina Jaimes Valdez, Liova Jaimes Almaraz, and Billy Dale Howard.  (Doc. 28-22 at 1.)

[15]  It is unclear whether the Billy Dale Howard the EEOC asked to interview is, in fact, the same individual the EEOC actually interviewed (Billy Dale Howell).  (Doc. 28-3 at 7-8 ¶ 20.)  If so, Billy Dale Howell and Richard Lee Brown were the only employees designated as playing a role in communicating with PBM's temporary staffing agency that the EEOC interviewed in the spring of 2008.

purchased PBM through a subsidiary corporation. (Doc. 18 (Cohen Declaration) at 2 ¶ 5.) The transaction, which closed in March 2008, sparked an exodus of PBM's executives. Indeed, in a three-month period beginning on March 28, 2008, PBM's chairman of the board, chief financial officer, chief administrative officer, and president all left the company. (Doc. 19 (Mussler Declaration) at 2.)

Despite the changes at PBM, the EEOC's investigation pressed on. In January and May 2008, the North Carolina Department of Motor Vehicles provided the EEOC with the national origin identifying information that the Commission had requested. (Doc. 28-3 at 8 ¶ 21.) Starting in May, the EEOC used that data to conduct another statistical analysis of PBM's temporary workforce, a task it completed by September 2008. (Id.)

On November 10, 2008, the EEOC sent PBM a fifth request for information, asking, this time, for the identities of those individuals in the company's "core group" of temporary workers.[16] (Id. ¶ 22.) The RFI also sought information about the hours worked by each of PBM's temporary workers for 2003, 2006, and 2007. (Id.) (The EEOC further represents that it had already

---

[16] Recall that PBM had used the term "core group" in its initial position statement that it submitted to the EEOC in January 2006. (Doc. 28-8 at 3-4.) The November 10, 2008 RFI appears to be the first time the EEOC requested information specifically about that group of temporary workers.

received this information from PBM's temporary staffing agency but that it "needed to also obtain it from [PBM] in order to confirm and verify its authenticity and reliability." (Id.))

PBM provided the requested information on December 2, 2008, in the form of five electronic databases. (Id. ¶ 23.) The EEOC then spent over eight months, from February 6, 2009, through October 19, 2009, conducting further statistical analysis "utilizing the data" from December 2, 2008. (Id. at 9 ¶ 24.)

By February 5, 2010, the EEOC had concluded its investigation, and the Commission conducted pre-determination interviews with PBM to review its conclusions. (Id. ¶ 25-26.) On February 23, 2010, the EEOC formally issued its Letter of Determination. (Id. at 10 ¶ 28.) The letter indicated the EEOC had found evidence that PBM had discriminated against individuals based on their race or national origin in three ways: first, by failing to place or assign non-Hispanic temporary workers to the company's "core group" of temporary workers; second, by providing fewer work hours to its non-Hispanic workers; and third, by failing to recruit or hire non-Hispanic job applicants. (Doc. 28-26 at 3.) The letter also invited PBM to a conciliation conference. (Id.)

On March 12, 2010, Yamira Moreno-Cruz, an EEOC investigator, outlined in a letter to PBM the remedies the EEOC would seek during conciliation if PBM agreed to a meeting.

42

(Doc. 28-27 at 1.) The letter explained that the Commission would seek, among other things, "damages," training for PBM's supervisors and managers, and compliance with Title VII. (Id.) Ms. Moreno-Cruz's letter, however, made no mention of a specific monetary sum the EEOC expected to recover or the size of the class for which it sought to obtain relief. (See id.) Nor did her letter -- or any subsequent communication from the EEOC, for that matter -- explain the factual basis for the EEOC's conclusions. (See id.)

PBM agreed to meet for conciliation, and the parties scheduled their conciliation conference for April 20, 2010. (Doc. 17 (Zaloom Declaration) at 7 ¶ 25; Doc. 28-3 at 10-11 ¶ 29.) Prior to the meeting, PBM's attorney asked the EEOC to provide specific information about the monetary damages the Commission would be seeking. (Doc. 28-3 at 11 ¶ 29.) In response the EEOC explained that it was "still collecting information related to . . . damages," "was in the process of interviewing as many class members as could be located regarding their damages," and would need to postpone the conciliation conference until it had completed that process. (Id.) Although the EEOC initially stated that conciliation could take place during the "middle of May," the EEOC did not attempt to reschedule the conciliation conference until late May or early June (Doc. 17 at 7 ¶ 26; Doc. 28-3 at 11 ¶ 30), but even then

43

the EEOC was "still in the process of giving [PBM] a 'ball park' figure [for damages that it would seek at the] conciliation conference" (Doc. 28-28 at 1).

When the parties eventually did meet for conciliation on July 14, 2010, the EEOC reviewed the allegations contained in its Letter of Determination, presented a draft conciliation agreement, and explained that the Commission had identified a class of 104 alleged victims of discrimination. (Doc. 17 at 7 ¶ 27; Doc 28-3 at 11-12 ¶ 31.) Those victims, the EEOC explained, "should have been placed in the core group" of temporary workers. (Doc. 28-3 at 12 ¶ 31.) According to the EEOC, it also "discussed" that it believed PBM had given a "disproportionate number of the total hours available . . . to Hispanic temporary workers," although, to the extent a second group of individuals were victims of that form of discrimination, the EEOC did not identify them and made no separate monetary demands related to them (id. ¶ 30). As the EEOC explained in a letter over one year later, at the time of conciliation the Commission's investigators believed that there were two classes of victims -- one group of workers who were not assigned to PBM's core group of temporary workers and a second group who received fewer work hours because of their national origin -- but that the EEOC "focused" on the damages sustained by the individuals not assigned to the company's core group of

44

workers. (Doc. 17-9 at 1.) According to the EEOC, therefore, "PBM was provided the opportunity to resolve the entire charge (both claims) for less money than if both claims had been included in conciliation." (Id.)

As it turned out, regardless of the damages on which the EEOC was focused, PBM was unwilling to pay "anything near" the EEOC's conciliation demands, and the conference failed. (Doc. 17 at 7 ¶ 27.) Indeed, just one day after the conference, the EEOC declared that further conciliation would be futile and that the case would proceed to litigation. (Doc. 28-31 at 1.)

Apparently unwilling to let the possibility of an amicable resolution slip away so quickly, PBM's attorney contacted the Commission in August 2010 and requested that the parties engage in a mediation session. (Doc. 17 at 8 ¶ 29.) As noted previously, after several weeks of discussions, the parties eventually agreed to mediate their dispute with no established monetary floor and set December 9, 2010, as the date for their meeting. (Id. ¶ 30-32.) PBM also informed the EEOC, as it had prior to conciliation, that in order for it to consider settling for an additional monetary amount above what it had offered at conciliation, the Commission would need to provide "detailed information related to the EEOC's damage calculations." (Doc. 28-32 (Mahood Declaration) at 2 ¶ 7.) Yet one week before the scheduled mediation, the EEOC's attorney informed PBM that it

45

"was in the process of finalizing the class and damages" and, thus, would be unable to mediate on December 9.  (Id.)

The parties rescheduled the mediation for March 22, 2011 -- a delay that was partially the result of the mediator's schedule.  (Doc. 17 at 9 ¶ 34; Doc 28-32 at 2 ¶ 7.)  Despite the passage of more than three months since the EEOC postponed mediation, PBM was still waiting on the requested damages information as the week of the mediation approached.  On March 14, 2011, PBM's attorney contacted the EEOC's attorney to remind her of his request for the information.  (Doc. 17 at 9 ¶ 35.) Three days later, on March 17, the EEOC responded with its new demand -- a figure five times higher than the Commission's demand at conciliation and which also included a floor that had been the EEOC's previous full demand.[17]  (Id.)  In the EEOC's view, the new demand was based on the discrepancy in the number of hours worked by PBM's Hispanic temporary employees versus the hours worked by the company's non-Hispanic temporary workers -- a theory of liability that potentially impacted a class of more than 1,300 victims and increased the Commission's claimed victim

_____

[17]  In the court's June 5, 2012 hearing, it granted PBM's Motion to Seal Un-Redacted Documents or Review in Camera (Doc. 23), in which PBM asked the court to review in camera un-redacted versions of its brief for summary judgment and supporting evidence that disclosed the monetary amounts of the EEOC's new demands.  The court finds it unnecessary to disclose at this time the specific monetary amounts of the demands.

class more than ten-fold.[18]  (Doc. 17 at 10 ¶ 41; Doc. 17-9 at 3-4.)

Although PBM believed, based on these developments, that mediation was a "delay tactic by the EEOC," it ultimately participated in the mediation session on March 22, 2010, but the parties were unable to reach an agreement.  (Doc. 17 at 10 ¶¶ 39-40.)  The parties then engaged in on and off negotiations through September 14, 2011, but on September 29, 2011, the EEOC filed this lawsuit.  (Doc. 28-32 at 2-3 ¶ 9.)

### 1.  Failure to Conciliate

Before the EEOC may file a suit for an alleged violation of Title VII, it must "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."  42 U.S.C. § 2000e-5(b).  The Fourth Circuit has held that conciliation is one of the EEOC's "most essential functions."  E.E.O.C. v. Raymond Metal Prods. Co., 530 F.2d 590, 596 (4th Cir. 1976).  The EEOC's failure to exhaust its administrative remedies deprives the federal courts

---

[18]  A September 1, 2011 letter from the EEOC puts the potential class at either 1,543 victims or 1,336, depending on how individuals who worked at PBM in more than one year are counted.  (Doc. 17-9 at 3-4.) It is unclear from the record how either number of victims was calculated, but of PBM's 3,929 temporary workers who worked at the company from 2003 through August 2007, the EEOC believes that a total of 189 more non-Hispanic workers -- an average of about 38 out of 786 workers per year -- should have been assigned additional hours.  (Id. at 3.)

of subject matter jurisdiction over the claim.[19]  Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009); E.E.O.C. v. Odd Fellows Home of Va., Inc., No. Civ. A. 6:04-CV-00046, 2005 WL 1950185, at *1 (W.D. Va. Aug. 15, 2005) ("For the EEOC to maintain subject matter jurisdiction in federal court, it must . . . fail in a good-faith attempt to conciliate the charge with the defendant.").  Where conciliation efforts are made, meanwhile, they must last at least thirty days, 42 U.S.C. § 2000e-5(f)(1); E.E.O.C. v. LJAX, Inc., 442 F. Supp. 2d 267, 268 (D. Md. 2006),[20] and must be made in good faith, E.E.O.C. v. Radiator Specialty Co., 610 F.2d 178, 183 (4th Cir. 1979).

Here, PBM contends that the EEOC failed to satisfy the jurisdictional prerequisite to litigation by failing to conciliate its claims that PBM provided fewer working hours to its non-Hispanic temporary workers.  (Doc. 15 at 26.)  In

[19] While the plaintiff bears the ultimate burden of proving jurisdiction, the party moving for summary judgment based on a lack of subject matter jurisdiction "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991) (utilizing a prior version of Rule 56).

[20] PBM has not contended that the EEOC failed to conciliate for a thirty-day period, and the facts indicate that the parties did conciliate for the requisite period.  The EEOC invited PBM to conciliate in a letter dated February 23, 2010 (Doc. 28-26 at 2) and indicated that all efforts had failed on July 15, 2010 (Doc. 28-31 at 1).  See LJAX, 442 F. Supp. 2d at 268 n.1 (noting that while section 706 does not specify when the thirty day period begins and ends, "courts have held that the period begins when the EEOC invites the defendant to participate in the conciliation process and ends with the EEOC's notice that further efforts would be futile").  Thus, for over four months the parties attempted to conciliate their claims.

48

addition, PBM argues that to the extent the EEOC did conciliate its claims, it failed to do so in good faith because of its constantly-shifting and ever-increasing demands during conciliation and mediation. (Id. at 27.) These failures to conciliate its work hours claim and to conciliate in good faith, PBM contends, entitle it to summary judgment. (Id. at 28.) The EEOC opposes the motion.

A court's scope of judicial review of the EEOC's behavior during the conciliation process is "'exceedingly narrow.'" Odd Fellows, 2005 WL 1950185, at *3 (quoting E.E.O.C. v. Newton Inn. Assocs., 647 F. Supp. 957, 959 (E.D. Va. 1986)). The Fourth Circuit has held that "[t]he law requires . . . no more than a good faith attempt at conciliation." Radiator Specialty, 610 F.2d at 183. In Radiator Specialty, the court found that the EEOC exhibited good faith where (1) its invitation to conciliate "fully informed defendant that there had been a reasonable cause determination with regard" to the claims raised against the defendant and (2) the defendant "was given several opportunities to participate in conciliation discussions." Id. Accordingly, where the EEOC "identifie[s] alleged violations of Title VII" and "provide[s] the defendants every opportunity to voluntarily comply with what the EEOC perceive[s] to be necessary to rectify the transgressions," it acts in good faith. Newtown Inn, 647 F. Supp. at 960.

Since Radiator Specialty, federal appellate courts have taken differing approaches in the level of scrutiny that should be used to review the conciliation process. See, e.g., E.E.O.C. v. Timeless Invs., Inc., 734 F. Supp. 2d 1035, 1052 (E.D. Cal. 2010) (characterizing the varying approaches to reviewing the conciliation process as a circuit split). The Sixth and Tenth circuits hold that "[t]he district court should only determine whether the EEOC made an attempt at conciliation. The form and substance of those conciliations is within the discretion of the EEOC as the agency created to administer and enforce our employment discrimination laws and is beyond judicial review." E.E.O.C. v. Keco Indus., Inc., 748 F.2d 1097, 1102 (6th Cir. 1984); E.E.O.C. v. Zia Co., 582 F.2d 527, 533 (10th Cir. 1978) ("[A] court should not examine the details of the offers and counteroffers between the parties, nor impose its notions of what the agreement should provide."). Other circuit courts require that the district court evaluate whether the EEOC has "(1) outline[d] to the employer the reasonable cause for its belief that Title VII has been violated; (2) offer[ed] an opportunity for voluntary compliance; and (3) respond[ed] in a reasonable and flexible manner to the reasonable attitudes of the employer." E.E.O.C. v. Asplundh Tree Expert Co., 340 F.3d 1256, 1259 (11th Cir. 2003) (citing E.E.O.C. v. Klinger Elec. Corp., 636 F.2d 104, 107 (5th Cir. Unit A Feb. 1981) (per

50

curiam)); E.E.O.C. v. Agro Distribution, LLC, 555 F.3d 462, 468 (5th Cir. 2009). PBM urges this court to take the latter, more active, approach.

Yet here, regardless of what scope of review is applied,[21] PBM's allegations fail. First, PBM's claim that the EEOC wholly failed to conciliate its unequal provision of hours claim is unsupported by the record. The EEOC's Letter of Determination -- the document that invited PBM to conciliation -- explains that the commission found reasonable cause for its claims that PBM (1) "fail[ed] to place and/or assign non-Hispanic applicants and temporary workers to its core group of regular temporary workers based on their national origin" and (2) "provid[ed] fewer work hours to non-Hispanic workers based on their national origin." (Doc. 28-26 at 2.) Thus, under any standard of review, the EEOC's Letter of Determination identified that it had found reasonable cause to pursue claims for both acts of discrimination. See E.E.O.C. v. Gen. Elec. Co., 532 F.2d 359, 366 n.14 (4th Cir. 1976) (noting that "the determination of reasonable cause defines the

---

[21] At least one district court has held that the "Fourth Circuit, in its early rulings on the subject, adopted the deferential standard of the Tenth and Sixth Circuits," E.E.O.C. v. McGee Bros. Co., No. 3:10-cv-142-FDW-DSC, 2011 WL 1542148, at *4 (W.D.N.C. Apr. 21, 2011), but another district court within the Circuit, apparently reading those early cases differently, has adopted the active approach, U.S. E.E.O.C. v. Lockheed Martin Global Telecomms., Inc., 514 F. Supp. 2d 797, 806 & n.17 (D. Md. 2007) (rejecting the Tenth Circuit's approach).

framework for conciliation" (citation and internal quotation marks omitted)); see also Radiator Specialty, 610 F.2d at 183 (explaining that the EEOC's determination letter "fully informed defendant that there had been a reasonable cause determination" with respect to the charges against it); E.E.O.C. v. Preston Hood Chevrolet, LLC, Civ. A. No. 1:08cv1265HSO-JMR, 2009 WL 2489184, at *2 (S.D. Miss. Aug. 13, 2009) ("The record reflects that the EEOC sufficiently outlined the reasonable cause for its belief that Title VII had been violated in its . . . determination letter."). Moreover, as is reflected in PBM's predetermination position statement, the company was on notice of the EEOC's allegation concerning the provision of working hours to non-Hispanic employees (Doc. 28-26 at 1) and had an opportunity to resolve those claims. See E.E.O.C. v. Hugin Sweda, Inc., 750 F. Supp. 165, 167 (D.N.J. 1990) (explaining that the EEOC "should at least put defendant on notice that a class action may be brought" during the conciliation process).

To the extent PBM complains that particular class members were not identified during the conciliation process, the EEOC is under no obligation to make such a disclosure. See E.E.O.C. v. Rhone-Poulenc, Inc., 677 F. Supp. 264, 265-66 (D.N.J. 1988) ("The EEOC is not required to provide documentation of individual attempts to conciliate on behalf of each potential claimant."); E.E.O.C. v. Paramount Staffing, Inc., 601 F. Supp.

2d 986, 990 (W.D. Tenn. 2009) ("'As long as the outline of the class is identified, each [person] within the class need not be specifically identified in the conciliation process.'" (quoting E.E.O.C. v. Cone Solvents, Inc., No. Civ. A. 3:04-0841, 2006 WL 1083406, at *9 (M.D. Tenn. Apr. 21, 2006))); U.S. E.E.O.C. v. Lockheed Martin Global Telecomms., Inc., 514 F. Supp. 2d 797, 806-07 (D. Md. 2007) ("The EEOC is not required to identify or negotiate in regard to each potential claimant in order to satisfy its duty of good faith attempts at conciliation."), aff'd, 876 F.2d 16 (3d Cir. 1989). In fact, the EEOC has no duty to "disclose all of the underlying evidence or information to the employer." E.E.O.C. v. Cal. Psychiatric Transitions, Inc., 725 F. Supp. 2d 1100, 1115 (E.D. Cal. 2010).

Second, PBM's "good faith" argument likewise fails under any standard of review. Under the deferential standard of the Sixth and Tenth Circuits, the court's role is simply to determine whether the EEOC made an "attempt at conciliation," leaving aside questions about the "form and substance" of the EEOC's offers. Keco Indus., 748 F.2d at 1102. There is no question that under this standard the EEOC attempted to conciliate its claims and, in fact, even reopened negotiations after formal conciliation ended when PBM suggested that the parties mediate their dispute. Cf. Timeless Invs., 734 F. Supp. 2d at 1052-53 (explaining that under the Sixth Circuit's

approach "a face to face conciliation meeting" and evidence that the "parties continued to negotiate" is "sufficient to establish a good faith conciliation under Keco").

Yet even under the more active approach PBM encourages the court to apply, the EEOC satisfied its burden to conciliate in good faith. As noted above, the EEOC provided notice of its determination that reasonable cause existed to believe that PBM violated Title VII and, during the conciliation process, also offered PBM an opportunity to voluntarily comply with its demands. Accordingly, the central question under the active approach is whether the EEOC "respond[ed] in a reasonable and flexible manner to the reasonable attitudes of the employer." Asplundh, 340 F.3d at 1259. "'Courts find th[e] reasonableness or flexibility of the EEOC lacking where it refuses to communicate or negotiate with the defendant.'" E.E.O.C. v. McGee Bros. Co., No. 3:10-cv-142-FDW-DSC, 2011 WL 1542148, at *4 (W.D.N.C. Apr. 21, 2011) (quoting E.E.O.C. v. Riverview Animal Clinic, P.C., 761 F. Supp. 2d 1296, 1301 (N.D. Ala. 2010)); see also Agro Distribution, 555 F.3d at 468 ("By repeatedly failing to communicate with Agro, the EEOC failed to respond in a reasonable and flexible manner to the reasonable attitudes of the employer."). "The EEOC's efforts should be considered sufficient if it made a sincere and reasonable attempt to negotiate by providing [the employer] with an adequate

opportunity to respond to all charges and negotiate possible settlements." E.E.O.C. v. UMB Bank, N.A., 432 F. Supp. 2d 948, 954 (W.D. Mo. 2006) (internal quotation marks omitted).

Here, there is no evidence that the EEOC failed to respond in a reasonable and flexible manner to PBM's reasonable requests or that it prevented PBM from responding to all charges and negotiating possible settlements. As an initial matter, it is noteworthy that PBM's concerns involve only the EEOC's behavior during the post-conciliation mediation process. (See Doc. 15 at 26 ("[T]o the extent that the mediation that PBM initiated could be deemed to be a conciliation effort by the EEOC, the EEOC did not participate in that process in good faith, despite having agreed to it.").) But because conciliation had already failed by that time, the EEOC was free to file a lawsuit regardless of what occurred during mediation. E.E.O.C. v. Optical Cable Corp., 169 F. Supp. 2d 539, 544 (W.D. Va. 2001) (holding that after the EEOC issued its notice that conciliation had failed, the Commission "had no further statutory duty to negotiate with Defendant in good faith" and that any later efforts to informally settle the parties dispute were "supererogatory"); see also E.E.O.C. v. Dial Corp., 156 F. Supp. 2d 926, 942 (N.D. Ill. 2001) ("Once Dial rejected the EEOC's counterproposal, the EEOC had no further duty at that point to conciliate any further." (citation and internal quotation marks omitted)).

55

Furthermore, even if the PBM-initiated mediation were considered part of the conciliation process, there is insufficient evidence that the EEOC refused to communicate or negotiate with PBM. The record reveals that the parties met face-to-face to conciliate their claims on July 14, 2010 (Doc. 17 at 7 ¶ 27), that the EEOC agreed to reopen negotiations in the fall of 2010 at PBM's request (id. at 8 ¶ 32), and that as late as September 1, 2011, the EEOC "remain[ed] interested in resolving this case prior to the filing of contested litigation" (Doc. 17-9 at 4). While PBM complains about the quintupling of the EEOC's settlement demand on the eve of mediation (Doc. 17 at 9 ¶ 36), see E.E.O.C. v. First Midwest Bank, N.A., 14 F. Supp. 2d 1028, 1032-33 (N.D. Ill. 1998) (finding good faith lacking where the EEOC refused to discuss the basis for its claim, imposed an arbitrary date for conciliation to end, and quadrupled its demand for damages without explanation), courts should typically refrain from "'examin[ing] the details of the offers and counteroffers between the parties,'" Riverview Animal, 761 F. Supp. 2d at 1301 (quoting E.E.O.C. v. Sears, Roebuck & Co., Civ. A. No. 79-1957 A, 1980 WL 108, at *13 (N.D. Ga. Mar. 14, 1980)). Even so, the court cannot say that on this record the increase in the EEOC's demand during the mediation, while significant, was without basis. And the EEOC's continued

interest in attempting to settle its claims prior to commencing litigation undercuts PBM's argument of lack of good faith.

To summarize, PBM fails to demonstrate that it is entitled to summary judgment on the basis of the EEOC's failure to conciliate or its failure to conciliate in good faith. The record demonstrates that the EEOC disclosed its claims against PBM prior to conciliation and that it attempted to resolve them. In addition, once formal conciliation failed, the EEOC was under no obligation to continue negotiations. Even if the Commission's participation in subsequent mediation could be viewed as further conciliation, there is insufficient basis to demonstrate that it was conducted with a lack of good faith. As a result, PBM's motion for summary judgment on this basis will be denied.

### 2. Laches

Congress did not establish a statute of limitations for civil actions brought by the EEOC. See Occidental Life Ins. Co. of Cal. v. E.E.O.C., 432 U.S. 355, 371-73 (1977). Nevertheless, the Supreme Court has explained that where the EEOC's "inordinate delay" in litigating a dispute results in a defendant being "significantly handicapped in making his defense," federal courts have the authority to "locate a just result." Id. at 373. In locating just results, courts apply the equitable defense of laches, which "requires a defendant to

57

prove '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 409 (4th Cir. 2005) (quoting White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990)). Lack of diligence is satisfied "where a plaintiff has unreasonably delayed in pursuing his claim." Id. A finding of prejudice, meanwhile, cannot rest on a defendant's "generalized assertions." E.E.O.C. v. Chesapeake & Ohio Ry. Co., 577 F.2d 229, 234 (4th Cir. 1978). "[It] must arise from and be assessed with respect to the facts of each individual claim." Id. Laches is an affirmative defense, and, as a result, where a movant seeks summary judgment on that basis, "it must conclusively establish all essential elements of [the] defense." Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012) (citing Celotex, 477 U.S. at 331).

PBM contends that the EEOC's delay in bringing this action has caused it significant prejudice and requires summary judgment against the EEOC. More specifically, PBM argues that the nearly six years between the filing of the charge and the formal commencement of this litigation was unreasonable. (Doc. 15 at 14.) PBM notes that there were two nearly year-long periods in which the EEOC had "no contact whatsoever with PBM," that the EEOC delayed or failed to interview certain employees

58

PBM believes are key to the litigation, and that the EEOC unnecessarily delayed the litigation by acting in bad faith during the post-conciliation mediation process. (Id. at 15-17.) In addition, PBM asserts that it has suffered prejudice as a result of these delays because two of its potential witnesses have died; significant turnover in the company's ownership and management and temporary-worker supervisor ranks have limited its ability to mount a defense; even those witnesses who are still available suffer limited memories of events as far back as 2003; the EEOC changed the timeframe and theory of liability several years after the charge was filed; and the delay has exposed PBM to greater monetary liability. (Id. at 18-25.)

The EEOC denies that it unreasonably delayed the course of the litigation or that PBM suffered any prejudice, although the EEOC's counsel candidly conceded at the hearing that she could not explain the delay any further than as set out here. In the EEOC's view, the mere passage of time does not indicate undue delay. Instead, it maintains, the six-year period between the charge and this lawsuit reflects the commission's active investigation of the charge and participation in conciliation and mediation in good faith. Moreover, the EEOC argues, even if the delay was unreasonable, PBM is unable to demonstrate the unique prejudice that would justify granting summary judgment against the EEOC.

59

Although no court has found a particular period of delay to be unreasonable per se, see E.E.O.C. v. Martin Processing, Inc., 533 F. Supp. 227, 229 (W.D. Va. 1982), there is no question that the nearly six years between the filing of the charge and the commencement of this lawsuit is lengthy, see E.E.O.C. v. Overnight Transp. Co., No. 2:02CV591, 2006 WL 2594479, at *6 (S.D. Ohio July 5, 2006) (holding that a five-year, six-month delay between a charge and lawsuit was unreasonable, even in a "complex case"). The EEOC's counsel acknowledged as much during the June 5, 2012 hearing,[22] and numerous federal courts have found delays of equal or less time to be unreasonable. See E.E.O.C. v. Massey-Ferguson, Inc., 622 F.2d 271, 277-78 (7th Cir. 1980) (finding a four-year, nine-month delay to be "unreasonable"); E.E.O.C. v. Liberty Loan Corp., 584 F.2d 853, 857-58 (8th Cir. 1978) (affirming the district court's determination that a four-year, four-month delay was unreasonable); E.E.O.C. v. Peterson, Howell & Heather, Inc., 702 F. Supp. 1213, 1221-22 (D. Md. 1989) (finding a sixty-three month delay to be unreasonable as a matter of law). Moreover, while the EEOC's reasonable explanation for a delay may trump the delay's length for the purpose of laches, see Overnight Transp., 2006 WL 2594479, at *6; E.E.O.C. v. Autozone, Inc., 258

---

[22]  The EEOC's attorney acknowledged "that the investigation took a substantial amount of time to complete."

F. Supp. 2d 822, 826-27 (W.D. Tenn. 2003), one court has held that even "fairly consistent" activity by the EEOC during a lengthy investigation is not sufficient to avoid laches "if the nature and quality of [the EEOC's investigative] activity are such as to not justify the delay," Peterson, Howell & Heather, 702 F. Supp. at 1221-22.

Here, PBM has identified serious questions about the nature and quality of the EEOC's handling of this case that, compounded with the five-year, eleven-month period between the filing of the charge and the commencement of this lawsuit, indicate that the delay in this case was unreasonable. Importantly, the Declaration of Michael Whitlow ("Whitlow"), which the EEOC submits to explain much of its prosecution of the case, fails to account for why the EEOC needed such lengthy amounts of time to conduct certain tasks. Whitlow, for example, does not address the necessity of the eleven-month period in which the EEOC "analyzed" PBM's defenses and "conducted labor availability analysis," even if certain information about PBM's workforce was not available until halfway through that period; the four-month statistical analysis in 2008; the eight-month statistical analysis in 2009, particularly in light of the fact that the EEOC admits that it had the necessary data for the analysis before that time; and the four-month period from October 2009 to February 2010 in which the EEOC offers no explanation of its

activities at all.[23] Equally troubling, the EEOC makes no representation about why it waited more than two years to attempt to interview many of the employees that PBM had identified as being responsible for communicating with its staffing agency -- a delay that ultimately prevented the Commission from speaking with at least four of the individuals it asked to interview. Nor does the EEOC make an effort to explain why it waited from January 20, 2006, until November 10, 2008, to first ask about the composition of PBM's "core group" of temporary workers. These unexplained and inadequately explained delays demonstrate that the EEOC was not sufficiently diligent in its handling of the case. Accordingly, the court finds that the EEOC's delay in bringing this lawsuit was unreasonable.

Of course, demonstrating that a delay is unreasonable is just half of PBM's battle in "conclusively establish[ing]" a defense of laches; the company must also show specific

---

[23] Rule 56(d) permits the court to "allow time to obtain affidavits or declarations or to take discovery" if a nonmovant, the EEOC in this case, shows by affidavit or declaration "that, for specific reasons, it cannot present facts to justify its opposition." Fed. R. Civ. P. 56(d)(2). While it is early in this case, laches is a threshold issue that could prevent the court reaching the merits of the EEOC's claim, and the EEOC has not claimed that additional discovery would assist it in rebutting PBM's contention that the delay between the filing of the charge and the commencement of this lawsuit was unreasonable. One reason it may not have so indicated is that information concerning the reasonableness of the delay, to the extent it may exist, is largely in the EEOC's possession. Thus, the court finds no reason to delay in reaching the question of whether the delay here was unreasonable.

prejudice.  See Ray Commc'ns, 673 F.3d at 299.  PBM believes that it has been the victim of specific prejudice, and in support of its argument does offer some specifics.  The company points to the fact that of the sixteen employees PBM identified as being responsible for communicating with its staffing agency, only two remain; twelve no longer work for the company[24] and two have died.[25]  (Doc. 19 at 2.)  Of the eight upper-level managers at the company in December 2005 (when the EEOC first requested information about PBM's management), just one remains there. (Id. at 2-3.)  PBM represents that the witnesses who remain have faded memories.[26]  It also points to the fact that the

---

[24]  As with PBM's other representations, see infra notes 25-26 and accompanying text, the court cannot find evidence of prejudice in the generalized allegations that these employees have left the company in the absence of a showing that information they possessed will be essential to PBM's defense.

[25]  PBM represents that both Greg Alan Pullman, a supervisor of PBM's temporary workers, and Peter Krusa, a manager, have died since the EEOC filed its charge.  (Doc. 17-5 at 3; Doc. 16-1.)  However, their deaths are inconclusive evidence of prejudice on this record in the absence of a showing that either of them possessed important information about PBM's potentially discriminatory work-assignment practices that is unavailable elsewhere.

[26]  PBM has submitted a "Declaration of Bradley 'Shawn' Hughes" ("Hughes") in support of its claim that its employees are unable to recall certain events related to temporary workers.  (Doc. 20.) Hughes, who supervised temporary workers as Fulfillment Bindery Supervisor from 1995 to 2010, explains that he recalls several instances of asking PBM's staffing agency not to place certain temporary workers with PBM in the future because of unsatisfactory job performance, but that he is unable to remember particular incidents or the races, ethnicities, or national origins of those workers.  (Id. ¶¶ 1-2, 7-10.)  The declarations of Richard "Rick" Brown (Doc. 22) and Michael Watson (Doc. 21), two other PBM employees with supervisory roles over the company's temporary workers, make similar

company was sold in 2008, and the extended delay has exposed it to increased monetary liability if it is found in violation of Title VII. Each of these factors, according to PBM, has been found to be evidence of prejudice, at least in certain circumstances. See E.E.O.C. v. Dresser Indus., Inc., 668 F.2d 1199, 1203 (11th Cir. 1982) (death of essential witnesses); E.E.O.C. v. Alioto Fish Co., 623 F.2d 86, 89 (9th Cir. 1980) (increased back pay liability); Liberty Loan Corp., 584 F.2d at 858 (extensive turnover); E.E.O.C. v. Bray Lumber Co., 478 F. Supp. 993, 998 (M.D. Ga. 1979) (witnesses' faded memories).

The Fourth Circuit, however, has repeatedly warned that "generalized allegation[s] of harm from the passage of time" do not constitute prejudice. Radiator Specialty, 610 F.2d at 183; see also Chesapeake & Ohio Ry., 577 F.2d at 234. Instead, a district court should withhold judgment on prejudice until "after the facts have been fully developed." E.E.O.C. v. Am. Nat'l Bank, 574 F.2d 1173, 1176 (4th Cir. 1978). Prejudice, the court notes, "must arise from and be assessed with respect to

---

representations. At this point in the litigation, however, it is unclear what importance this information will have as to the issues to be litigated in the case. In addition, there has been no showing that, in the absence of any delay, PBM's witnesses would be any more likely to recall particular hiring or work-assignment decisions involving particular employees given the thousands of temporary workers who passed through PBM's doors during the relevant period. (See Doc. 15 at 21 (noting that "thousands" of temporary workers performed work for PBM during the 2003-2007 time period).)

64

the facts of each individual claim." Chesapeake & Ohio Ry., 577 F.2d at 234.

Here, PBM's attempt to identify specific instances of prejudice is hampered by the fact that the EEOC has yet to fully explain its theory of the case. The EEOC represents that it intends to proceed with the burden-shifting approach set forth in International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977), under which the EEOC intends to demonstrate its statistical evidence to prove a prima facie case of discrimination, which then shifts the burden to PBM to rebut. But because the EEOC has yet to disclose how it calculated evidence of discrimination and which employees were allegedly discriminated against, PBM cannot assess the extent of prejudice, if any. For example, PBM does not know whether mounting a defense will require that it call unavailable former managers or executives to testify in its favor to rebut claims about the company's management practices during the relevant period, or whether it can sufficiently negate the EEOC's case with existing sources of proof of non-discriminatory reasons for its decisions. Thus, while PBM points to particular employees who have faded memories of events as far back as 1993, some who have passed away since the filing of the EEOC's charge, and others who have long since left its employment, in the absence of more concrete information from the EEOC about the type of

65

proof it will use to establish its case, the court cannot determine whether these employees' faded memories, deaths, or departures have resulted in specific prejudice to PBM's ability to mount a credible defense.  See Chesapeake & Ohio Ry., 577 F.2d at 234 (holding that generalized allegations of harm do not constitute prejudice).  Similarly, PBM's concerns about its potentially increased monetary liability are premature at this stage of the litigation.  See Am. Nat'l Bank, 574 F.2d at 1176; see also Gen. Elec. Co., 532 F.2d at 371-72 (explaining that while it is within the court's power to limit a defendant's liability on equitable grounds, whether to do so is a "matter better to be resolved after trial").

Still, on this record the court is reluctant to subject PBM to a costly and potentially lengthy discovery period when serious issues of equity could prevent the court from reaching the merits of the case.  The assessment of prejudice is a threshold issue, which can be made after a period of limited discovery confined to the EEOC's theory of the case and any prejudice to PBM.  Some courts have taken this very approach. See Mahmood v. Research in Motion Ltd., No. 11 Civ. 5345(KBF), 2012 WL 1801693, at *1 (S.D.N.Y. May 16, 2012) (noting that the court had determined limited discovery to be the "most efficient [way] to reach a prompt final determination as to the issue of laches"); Appel v. Kaufman, 728 F. Supp. 2d 684, 692 (E.D. Pa.

66

2010) (noting that the court had permitted limited discovery on the issue of laches at an earlier point in the case), aff'd, No. 11-1879, 2012 WL 1435988 (3d Cir. Apr. 26, 2012).

PBM acknowledges limited discovery as a possibility, but it urges the court to go further. The company contends that its evidence conclusively establishes specific instances of prejudice and that on this record the court has sufficient cause to issue judgment in its favor. PBM cites to several cases in support of its position: Dresser Industries, 668 F.2d 1199, Alioto Fish Co., 623 F.2d 86, Liberty Loan, 584 F.2d 853, Martin Processing, 533 F. Supp. 227, and Bray Lumber Co., 478 F. Supp. 993. At least on this record, however, none of PBM's cases demands the result that the company counsels.

In Dresser, for example, the court found prejudice where certain witnesses "crucial to [the defendant's] defense" -- those who had actually interviewed the applicant and denied her a job -- were unavailable because of the EEOC's delay in bringing its lawsuit. 668 F.2d at 1203. In the present case, by contrast, PBM has not alleged the unavailability of specific witnesses who will be crucial to its defense. Certainly PBM has identified employees who are unavailable and others who have faded memories, but it remains unclear whether this has caused particularized and specific prejudice to PBM.

This distinction is important because *Dresser*'s focus on the unavailability of witnesses who played key roles in hiring or employment policy decisions is a pivotal commonality in the finding of prejudice throughout PBM's cited authority. In *Alito Fish*, the EEOC's conciliator had passed away, its lead investigator had left the Commission, and the complaining party that precipitated the EEOC's pattern or practice case could not recall whether she had even applied for a job at the defendant's company at the time of the lawsuit. 623 F.2d at 88. In *Liberty Loan*, the court found prejudice where "[n]one of the supervisors connected in any way with the employment [of the complaining party continued to] work for defendant" and the office at the root of the charge had been shuttered before the filing of the lawsuit. 584 F.2d at 858. Moreover, by the time of the much delayed lawsuit in *Martin Processing*, the only two employees in charge of the defendant's hiring and layoff decisions who had overseen the allegedly discriminatory policies had left the company (one by death), as had their two successors, while other supervisors -- those vested with authority over allegedly discriminatory layoffs at the company -- had all left the company or had died. 533 F. Supp. at 231-32. Finally, even in *Bray Lumber*, a case decided before much of the appellate authority on prejudice in Title VII cases was available, the court noted that "key personnel in labor, supervisory and

68

management positions" had left the company and that significant prejudice had accrued to the defendant because it was not informed "that any individual or the EEOC contemplated or was authorized to institute litigation in the matter," which meant that the company took no efforts to preserve any evidence related to the "minor employment dispute" at the root of the claim. 478 F. Supp. at 998.

Thus, on this record and absent particular information on the EEOC's theory of the case upon which any prejudice finding could be made, PBM cannot obtain summary judgment, and the court can do no more than say that PBM's argument may have merit. On the current record, therefore, the court will order that the parties, after developing a schedule under the supervision of the Magistrate Judge, engage in limited discovery on two issues: first, the EEOC must disclose its theory of the case and method for establishing it so that PBM can assess whether and, if so, how it may be prejudiced; and second, PBM's potential prejudice resulting from the EEOC's unreasonable delay in bringing this lawsuit. Following this limited discovery, PBM may renew its motion for summary judgment or elect to abandon it, in which case the Magistrate Judge will coordinate a pretrial schedule.

## III. CONCLUSION

For the reasons stated herein, therefore,

IT IS ORDERED that PBM's motion to dismiss (Doc. 12) is GRANTED with respect to individuals on whose behalf the EEOC is seeking relief whose claims accrued more than 180 days before October 17, 2005, and who did not also experience discrimination after that date; in all other respects, the motion to dismiss is DENIED.

IT IS FURTHER ORDERED that, because the court finds that the EEOC'S delay in bringing this action was unreasonable, as to PBM's motion for summary judgment based on laches (Doc. 14) the parties are granted an opportunity to conduct discovery limited to the following: (1) the EEOC must disclose its theory of the case and method for establishing it so that PBM can assess whether and, if so, how it may be prejudiced; and (2) whether PBM suffered prejudice in fact resulting from the EEOC's unreasonable delay in bringing this lawsuit.  The parties shall confer with the Magistrate Judge to develop a schedule for conducting this discovery.  In all other respects, PBM's motion for summary judgment is DENIED.

Following this limited discovery, PBM may renew its motion for summary judgment; or PBM may elect to abandon it, in which case the Magistrate Judge will coordinate a pretrial schedule.

/s/   Thomas D. Schroeder
United States District Judge

June 28, 2012